**UNITED STATES DISTRICT COURT**

**DISTRICT OF CONNECTICUT**

UNITED STATES OF AMERICA          :

                                              :          ss: New Haven, Connecticut

COUNTY OF NEW HAVEN               :

**AFFIDAVIT**

I, Jonah Mazzacane, being duly sworn, hereby depose and state as follows:

**<u>INTRODUCTION</u>**

1.      I am employed as a Special Agent with the Drug Enforcement Administration (hereinafter, "DEA") and have been so employed since February 2009.

2.      I am currently assigned to the DEA New Haven District Office (hereafter, "NHDO") Task Force (hereafter, "TF"), which investigates drug traffickers and organizations responsible for manufacturing illicit and/or diverting licit opioids and other drugs within the State of Connecticut. During my assignment to the DEA NHDO TF, and previous assignments to the DEA New York Drug Enforcement Task Force, I have prepared numerous affidavits in support of applications for federal search warrants and arrest warrants, as well as in support of authorizations to conduct electronic surveillance.  As a case agent, I have directed and coordinated electronic surveillance, controlled purchases of drugs, physical surveillance, and undercover activities, as well as debriefed and managed confidential sources.  I am familiar with the manner in which individuals obtain, finance, store, manufacture, transport, and distribute their illegal drugs.  I have a Bachelor of Science degree from Roger Williams University.  I have completed the sixteen-week DEA Basic Agent Trainee academy in Quantico, Virginia.  Prior to my career with the DEA

1

I was a Police Officer in Torrington, CT for approximately 4 years.  I have also attended numerous law enforcement training courses related to the field of drug law enforcement.

3.      I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7) in that I am empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516. Currently, I am involved in an investigation involving an identified distributor of fentanyl and heroin in Waterbury, Connecticut. I make this affidavit in support of a search warrant directed at Verizon Wireless for telephone text messages and other content, described in Attachment A, associated with the cellular telephone with assigned telephone number 203-802-7764 for January 1, 2018 through the date of January 11, 2018. The telephone is subscribed to John Carlos, 118E Angel Dr, Waterbury, CT.  The above referenced communications are believed to be evidence in furtherance of his possession with intent to distribute fentanyl and heroin in violation of 21 U.S.C. § 841(a)(1) and conspiracy to distribute fentanyl and heroin, in violation of 21 U.S.C. § 846. This cellular telephone will be referred to herein as "the target telephone."

4.      This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrant and does not set forth all of my knowledge about this matter. The statements contained in this affidavit are based, in part, on the information provided by Special Agents and Task Force Officers of the DEA, as well as the Southington Police Department and officers from other law enforcement agencies; on law enforcement officers' review of seized electronic evidence (including stored text messages) and on experience and training of the affiant.

2

## BACKGROUND OF THE INVESTIGATION

5.      This investigation by the DEA NHDO TF involves the investigation into a fentanyl overdose that has resulted in death.  The fentanyl source of the supply has been identified as an individual utilizing 203-802-7764. The overdose occurred in Southington, Connecticut on or about November 30, 2017.

6.      Thus far in the investigation, investigators were able to analyze telephone text messages recovered from the cellular telephone of the Victim, analyze telephone toll records associated with the source of supply, review medical records and speak with witnesses involved with the investigation.

7.      This investigation involves at least one individual distributing fentanyl and heroin. Fentanyl being a Schedule II controlled substance and heroin a Schedule I controlled substance.  Both fentanyl and heroin are heavily abused and trafficked throughout the United States due to the recent opioid epidemic. In particular, I am investigating violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute, and distribution of, fentanyl/heroin) and 21 U.S.C. § 846 (conspiracy to distribute fentanyl/heroin).  This investigation by the DEA NHDO TF involves information provided by a credible witness, surveillance efforts by law enforcement and information gleaned by investigators from commercial and government database checks.

## PROBABLE CAUSE

### INVESTIGATION OF VICTIM

8.      On December 1, 2017, at approximately 10:04 am the Southington Police Department responded to 80 School Street, Southington CT for the report of an unresponsive

thirty six year old male (hereafter referred to as Victim).  Patrol officer Russel Vernali responded

at approximately 10:10 am and made contact with the complainant, the victim's mother (hereafter

referred to as Witness 1.  Witness 1 stated she had found her son unresponsive in his bedroom.

Officer Vernali immediately went upstairs to the Victim's bedroom and observed the Victim to be

slumped over on the floor in a sitting position on the right side of the bed closest to the window.

The Victim was not breathing, was cold to the touch, had no carotid pulse, and was in full rigor

mortis.  Officer Vernali also observed signs of dependent lividity on the Victim's face and

extremities.  A stream of dried blood approximately four inches long and a half inch wide was

also observed on his right forearm which likely came from his nose which was just above his

forearm.

9.   AMR paramedics arrived on-scene at approximately 10:15 am.  AMR paramedic John

Racloz attached a heart monitor to the Victim and found no signs of life.  Racloz pronounced the

Victim dead at approximately 10:17 am.  Racloz stated he believed the Victim to have been dead

for at least twelve hours or more based on his observations.

10.   Officer Vernali then spoke further with Witness 1 regarding the Victim's medications,

overall health, and lifestyle.   Witness 1 stated Victim had a history of drug abuse and overdosed

recently within the last two or three weeks in Waterbury for which he had to be revived by

paramedics using Narcan.  Witness 1 stated that the Victim had to start wearing adult diapers

because his/her bladder had been badly damaged from opioid abuse.  Witness 1 stated the Victim

had a history of depression and had attempted suicide in the past.  Witness 1 stated the Victim

suffered from anxiety and was prescribed the following medications: Gabepentin, 300 mg for

social anxiety, Oxcarbazepin 300 mg for manic depression, Quetiapine 50 mg for manic depression, Tamsulosin 0.4 mg for urinary retention.

11.   Witness 1 stated the Victim did not have a primary care physician and received his medication from Salute Homecare which provided him with a daily dose of meds to help prevent him from abusing his prescription medications.

12.   Officer Vernali also obtained a sworn written statement from Witness 1 as follows:

"I went out yesterday to run errand and returned home around 3 pm.  The Victim was not home at the time.  The Victim's car was in the driveway.  Witness 1 called the Victim [on the phone] at which time the Victim  stated he/she was with "first name of Witness 1" but did not say where, but said he/she would be home soon.  The victim came home after 5:00 pm but Witness 1 did not see the vehicle that dropped the Victim off.  In the past the Victim has been dropped off or picked up by someone in a little red car.

13.   When the Victim came home he/she had a black bag with beer in it.  Victim 1 then nibbled on some food that was on the counter and went up to his room.  At approximately 6 pm Witness 1 brought a plate of food up to his/her room and placed it on the bed.  The Victim was sitting on the right side of the bed closest to the window and was smoking a cigarette.  The Victim turned around toward Witness 1 and said "Thank you.  I love you".  Witness 1 then left the room.

14.   Witness 1 got up this morning around 10 am and noticed the Victim's car in the driveway and knew he/she had a 8:30 am appointment with probation.  Witness 1 also noticed he/she hadn't used the coffee maker yet like he/she usually does when he/she gets up.  The victim has a history of depression and drug use and has made attempts to harm himself recently.

15.  At approximately 10 am Witness 1 went up to his/her room to check on the Victim

and saw the plate of food still in the same place on the bed which looked to be untouched.

Witness 1 didn't see the Victim right away but then saw the top of his head as he/she was slumped

over on the floor next to the bed.  Witness 1 asked "what happened? Are you all right?"  The

Victim did not answer, so Witness 1 walked over to him/her and touched his arm and hand but he

was cold to the touch.  Witness 1 tried to move his arm but could not.  Witness 1 then came

downstairs and called the police [end of statement].

16.  The Southington Police Department detective bureau was notified and arrived a short

time later to process the scene which was performed by Detective Lopa, Detective Apicella, LT

Suski, and Detective Marenholz.

17.  At approximately 11:55 am Detective Marenholz and Lt Suski arrive at 80 School

Street.  Upon Detective Marenholz' arrival he spoke with Detective Appicila who advised him

that the Victim was located in the second floor bedroom.  Detective Lopa also stated that he

recovered two white wax folds on the ground outside of the window to Joshua's bedroom.

Detective Lopa stated that he secured the wax folds to ensure that they did not blow away from

the scene.  Detecitve Lopa advised that Witness 1 told him that the Victim used the western

window in his/her bedroom as an "ashtray" and which would explain why the screen was ajar and

why the wax folds were located on the ground directly below the window.  Detective Lopa stated

that he collected the wax folds and entered them as Exhibit #1 for this case.

18.  Detective Marenholz also interviewed Witness 1, who stated that the he/she called the

Victim the previous night (November 30, 2017).  During this phone call the Victim stated that

he/she was out with "First name of Witness 2).  Witness 1 stated that Witness 2 is a fairly new

friend to Joshua, and believed they met while the Victim was admitted at St. Mary's Hospital in

Waterbury in September 2017. Witness 1 did not know Witness 2's last name or any further

information about her, other than she was a heavy set white female who operated a small red

colored vehicle.

19. Detective Marenholz asked Witness 1 about the Victim's recent medical conditions.

Witness 1 stated the above listed information. Witness 1 also stated that the Victim was had been

admitted to the hospital for suicidal thoughts. Witness 1 pointed out a black colored lock box that

contains the victim's medications and stated that the visiting nurse is the only one with the key to

the lock box. Witness 1 signed a Southington Police Department Consent to Search form

allowing Detectives to search the Victim's room for anything of evidentiary value.

20. Detective Marenholz went to the second floor of the residence, where two bedrooms

are located. One bedroom was used exclusively for storage, and the other bedroom belonged to

the Victim. The Victim's bedroom is located on the southwest side of the residence. Upon

entering the Victim's bedroom Detective Marenholz observed the Victim's body hunched over on

the floor in a frog like position next to the west side of the bed. The head of the bed is against the

north wall of the bedroom, with the open window on the west wall and the door to the bedroom

on the northeast corner of the room. An amount of red blood like substance was observed on the

right lower arm directly below the Victim's nose/mouth. A burnt cigarette was positioned in

between the Victim's right pointer and middle fingers.

21. During a preliminary visual inspection of the area where the Victim's body was

discovered, Detectives identified white colored wax folds that appeared to be stamped "LIKE

THAT" on a chair located in the northwest corner of the room by the Victim's body. Several

black colored plastic bags were found containing empty beer cans and small alcohol bottles.  After a further search of the victim's bedroom, Detectives discovered ripped white wax folds on the bed sheets, two unknown prescription capsules, a white cellophane wrapper containing a crushed white substance, five (5) prescription bottles containing prescription medication, one prescription push pop pack [blister pack] with medication and one burnt glass tube with charring on one end.

23.   Detective Lopa photographed the outdoor area of the west side of the residence below the Victim's bedroom and exterior of the residence.  The following items were seized from the scene of the Victim's residence; One ripped white wax fold with black lettering, one white wax fold stamped "LIKE THAT" in black ink containing a tan colored powder substance, one black colored LG brand cellular telephone with charger, one ripped section of a white wax fold, two loose pills (Gabapentin and Oxcarbazepine), one cellophane wrapper containing pieces of crack cocaine, two ripped sections of white wax folds, five prescription pill bottles in the name of the Victim (naltrexone, doxepin, risperidone, trazodone, and oxcarbazepine, one pack of trazodone in the name of the Victim, one burnt glass pipe with copper mesh wiring, two pill containers.

24.   Officer Vernali then contacted the Office of the Chief Medical Examiner (OCME) and spoke with Marissa Edelberg at which time Officer Vernali provided her with the necessary information.  Edelberg provided OCME case number 17-20215.  Officer Vernali remained on-scene until the OCME completed their investigation and removed the body from the home at approximately 2:30 pm.

25.   On December 5, 2017, Detective Marenholz was provided further information regarding Witness 2.  Witness 1 stated that the Victim's friend (First name provided) messaged via facebook Witness 1's other child on December 4, 2017, expressing her sympathy.  Witness 1 stated the

same person depicted in the Facebook profile was the same person she saw when Witness 1

visited the Victim at the hospital after the Victim overdosed in September.  Witness 1 further

explained that he/she recalls the Victim point out an area in Waterbury where his "boy" lives.

## WITNESS #2  DEBRIEFING

27.      In December 2017, I (SA Mazzacane) interviewed Witness 2 with Detective

Marenholz.  Witness 2 stated the following:

28.      On the day prior to the victim's death Witness 2 drove to Ocean State Job Lot in

Waterbury in the vicinity of a Walmart, Target, and a Thrift Store.  The victim had been using his

cell phone to text someone while they were together.  After they arrived at Ocean State, victim

spoke to someone briefly utilizing victim's cell phone.  Victim stated, "I'm at Job Lots".

29.      A brief time later a white, compact car, that appeared to be a newer model arrived

and parked diagonally from Witness 2 's vehicle.  Witness 2 was unable to clearly see the

occupants of the vehicle but there appeared to be multiple occupants, possibly one or two

occupants in addition to the driver.

30.      The victim exited Witness 2's vehicle and approached the white car at it's driver's

window.

31.      The victim came back to Witness 2 's vehicle and showed Witness 2 a small plastic

sandwich bag which had been tied off, which further contained approximately "four bags and

some crumbs".

32.      Witness 2 had not seen crack cocaine or heroin before this experience.

9

33.     Witness 2 then drove to a second gas station where the victim purchased copper wiring.  The victim utilized the copper wiring and a pen to fashion a pipe.  The victim utilized the pipe to smoke the crumbs from the sandwich bag.

34.     After the victim smoked he was "out of it" for a while.  Witness 2 and the victim then went to the Afghan restaurant in Waterbury and went inside to eat.

35.     The victim's demeanor was more friendly than normal in the restaurant.  Witness 2 was unsure if it was due to the drugs that he smoked or if it was a product of the victim's bipolar disorder.

36.     Witness 2 and the victim ~~again~~ argued about the victim doing drugs and Witness 2 attempting to harm himself/herself in the past.

37.     Witness 2 brought the victim home after eating at the restaurant.  The victim had been acting lethargic, had slower speech, and fell asleep en route to his residence.  When they arrived at his residence the victim left the vehicle and walked to his/her house on his/her own.

38.     Witness 2 provided his/her cell phone number to SA Mazzacane and Detective Marenholz.

### ANALYSIS OF VICTIM'S CELLULAR TELEPHONE

39.     On December 1, 2017, Detective Marenholz conducted a logical forensic download of the cellular telephone that was seized from the Victim's bedroom.

40.     A review of the SMS messages show that the Victim sent his first SMS message to an unrelated person in relation to this investigation on November 30, 2017, at 6:43 am

indicating the beginning of his day.  At 9:13 am the Victim sent a SMS message to a contact

named Witness 2's first name, stating "good morning".  The SMS message log lists Witness 2's

first name with the same phone number Witness 2 provided to investigators.  From this point

forward the Victim and Witness 2 had continuous SMS contact until 1:20 pm that same day

(November 30, 2017).  During the SMS transactions between the Victim and Witness 1, the

conversation read that the Victim and Witness 2 were making plans to get together between

1:30pm and 2 pm.  At 1:20 pm Witness 2 sent the Victim a SMS message "Here I am"

 41. At 1:35 pm the Victim initiates a SMS message to a contact listed in cellular phone

as "Hill Steve Long" and "Steve Long Hill" with a phone number of 203-802-7764.  The

following is a SMS conversation between the Victim and "Hill Steve Long" on November 30,

2017:

 To:  "Hill Steve Long" 1:35:08 pm -  You you around

 From: Hill Steve Long" 1:35:42 pm - Wutchu wantd

 To: "Hill Steve Long" 1:36:40 pm - Id like a half white and a half h please

 To: "Hill Steve Long" 1:46:02 pm - I'll be there in a min

 To: "Hill Steve Long" 1:46:27 pm – Ok

 From: "Hill Steve Long" 1:46:44 pm – Ok 20 min

 From: "Hill Steve Long" 1:46:57 pm -- Where

 To: "Hill Steve Long"   1:49:35 pm – Where your at long hill right???

 From: "Hill Steve Long" 1:50:01 pm – Joblot

 To: "Hill Steve Long" 1:50:33 pm – Wheres that? ?

 To: "Hill Steve Long" 1:54:25 pm – Ok ok ill meet you there

From: "Hill Steve Long" 1:55:55 pm – How much money u got

To "Hill Steve Long" 1:56:22 pm – 50

To: "Hill Steve Long" 1:57:06 pm – Im here where you at

From: "Hill Steve Long" 1:57:33 pm – Kumin frm Hartford

To: "Hill Steve Long" 1:58:34 pm – So how long do i gotta wait????

From: "Hill Steve Long" 2:03:05 pm – 20

To: "Hill Steve Long" 2:04:32 pm – Hurry up im across the st at the package store.  Please

hurry up

To: "Hill Steve Long" 2:07:24 pm - Hurry up please

To: "Hill Steve Long" 2:16:36 pm - Where the fuck are you

To: "Hill Steve Long" 2:20:00 pm - Im at the package store next store ok in maroon car

To: "Hill Steve Long" 2:20:20 pm - You got me please

From: "Hill Steve Long" 2:29:46 pm – Yeah

To: "Hill Steve Long" 2:29:54 – Im at the package store hit me up when you

To: "Hill Steve Long" 2:33:16 pm – Ok

To: "Hill Steve Long" 2:33:57 pm – Ill be thete in a few ok

From: "Hill Steve Long" 2:34:46 pm – How lng

To: "Hill Steve Long" 2:35:37 pm – In a few

To: "Hill Steve Long" 2:35:16 pm – (no content)

To: "Hill Steve Long" 2:36:38 pm – With. One

From: "Hill Steve Long" 2:37:16 pm – U want it or na

To: "Hill Steve Long" 2:37:55 pm – On east main

To: "Hill Steve Long" 2:39:03 pm – Where

From: "Hill Steve Long" 2:39:35 pm – Goto joblot

To: "Hill Steve Long" 2:39:55 pm – Ok

To: "Hill Steve Long" 2:40:50 pm – Ok oll be there in a sec

To: "Hill Steve Long" 2:43:34 pm – Whete3

To: "Hill Steve Long" 2:44:29 pm – Im hear

From: "Hill Steve Long" 2:44:44 – Almost there

To: "Hill Steve Long" 2:45:57 pm – Ok im in an old ass haydai red ass card

To: "Hill Steve Long" 2:48:01 pm – Where the fuck are you

To: "Hill Steve Long" 2:52:58 pm – Ate you here yet??

From: "Hill Steve Long" 2:53:33 pm – Almost

To: "Hill Steve Long" 2:54:27 pm – Please hurry up

To: "Hill Steve Long" 3:00:57 pm – Yo im at ocean st where the fuck are you

Voice Call received from: "Hill Steve Long" 3:01:23 pm , duration 00:01:17

Voice Call received from: "Hill Steve Long" 3:03:21 pm, duration 00:00:14

To: "Hill Steve Long" 3:53:07 pm – Yo i need more

To: "Hill Steve Long"  3:53:44 pm – Yes

From: "Hill Steve Long" 3:54:32 pm - How much money u got an what u want

To: "Hill Steve Long" 3:55:44 – 40

From: "Hill Steve Long" – 3:56:13 pm – of what

From: "Hill Steve Long" – 4:03:44 – Joblot how lng

To: "Hill Steve Long" – 4:04:40 pm – 20 of crackof crack god damit

13

From: "Hill Steve Long" – 4:05:25 pm – Hurry up

To: "Hill Steve Long" – 4:10:06 pm – Im at the Afhan place be cool and at least deliver it for me

From: "Hill Steve Long" – 4:10:54 pm – Na

To: "Hill Steve Long" – 4:11:26 pm – Ok then

From: "Hill Steve Long" - 4:23:09 pm – U Gd?

To: "Hill Steve Long" – 4:24:38 pm – Don't. Have a car back stuck at the afgan place.

## TOLL RECORD ANALYSIS

42.     During the course of this investigation, investigators issued an administrative subpoena to Verizon requesting subscriber, toll record and other information for telephone number 203-802-7764.

43.     This information was requested for the approximate thirty nine (39) day period of November 1, 2017 through December 8, 2017.

44.     According to Verizon, telephone number 203-802-7764 is subscribed to: John Carlos, 118E Angel Dr, Waterbury, CT.  According to Verizon, telephone number 203-802-7764 contacted the Victim's phone 860-329-4235 on November 30, 2017, sixty (60) times.

## REQUEST FOR TEXT MESSAGE PRESERVATION

45.     During the course of this investigation, investigators requested that Verizon, which has the ability to preserve text messages content sent and received on the target telephone serviced by Verizon. Verizon, with proper legal process will provide the content of the text messages to law enforcement. The text messages that are preserved, and later available to law enforcement, are of a limited duration of days.

14

46.     On January 11, 2018, members of the DEA NHDO TF sent a preservation request to Verizon Wireless requesting that certain information associated with the Target Telephone 203-802-7764, including text messages for the prior ten days, be preserved.  I was subsequently informed that the request had been received and processed, but only 8 days were preserved (January 5, 2018 through January 11, 2018). Based upon my working knowledge of preservation requests, and specifically having worked with Verizon Wireless to obtain text message content and other information in other investigations, I understand that with proper legal process, this information will be available to law enforcement. Thus, even if certain information has been deleted from the Target Telephone and is no longer available on that device, such information is being preserved by and will be available from Verizon Wireless.

## ANALYSIS OF TEXT MESSAGES

47.     Given my training and experience, I know that distributors of illegal drugs use cellular telephone to further their drug distribution activities. These communications often involve the use of traditional telephone calls and text messaging. With respect to this investigation, I believe that the text message communications were completed in furtherance of the target telephone's drug distribution activities. Given my training and experience, and knowledge of this investigation, I believe that "Steve Long Hill" continues to use the target telephone to communicate via traditional telephone calls and text messages in furtherance of his drug distribution activities.

48.     A commercial data base search of 203-802-7764 reveals that this telephone number is associated with Matthew S. LOVE, with listed dates of birth in January and November of 1989, with associated addresses of 14 Long Hill Rd, Waterbury, CT and 15 Anesa Avenue, Waterbury, CT.   A criminal history search of Matthew S. LOVE, revealed that Mattew LOVE, date of birth November 4,

1989, 14 Long Hill Rd, Waterbury, was arrested by Connecticut State Police Troop A, on June 24, 2017 for two counts of possession of a controlled substance (21a-279(a)(1).

49.     It is commonplace for drug dealers and their customers to utilize nicknames in order to protect their identities from one another and law enforcement.  It is also commonplace for customers to list their drug dealers in their cellular telephones as the nicknames they use and/or a location they have met that drug dealer in the past.

## REPORT OF AUTOPSY

50.     On January 31, 2018, Detective Marenholz received OCME results for the autopsy and toxicology for the Victim.  The cause of death was listed as: acute combined heroin, fentanyl, and alcohol toxicities.

## BACKGROUND TO STORED COMMUNICATIONS

51.     In my training and experience, I have learned that Verizon Wireless is a company that provides cellular telephone access to the general public, and that stored electronic communications, including retrieved and retrieved voicemail, text, and multimedia messages for Verizon Wireless subscribers may be located on the computers of Verizon Wireless.  Further, I am aware that computers located at Verizon Wireless contain information and other stored electronic communications belonging to unrelated third parties.

52.     Among the services commonly offered by wireless phone providers is the capacity to send short text or multimedia messages (photos, audio, or video) from one subscriber's phone or wireless device to another phone or wireless device via one or more wireless providers.  This service is often referred to as "Short Message Service" ("SMS") or "Multimedia Messaging Service" ("MMS"), and is often referred to generically as "text messaging" or "wireless messaging."  Based on

my knowledge and experience, I believe that stored electronic communications, including SMS and MMS messages that have been sent or received by subscribers, may be stored by Verizon Wireless for short periods incident to and following their transmission.  In addition, providers occasionally retain printouts from original storage of text messages for a particular subscriber's account.

53.     Wireless phone providers typically retain certain transactional information about the use of each telephone, voicemail, and text-messaging account on their systems.  This information can include log files and messaging logs showing all activity on the account, such as local and long distance telephone connection records, records of session times and durations, lists of all incoming and outgoing telephone numbers or e-mail addresses associated with particular telephone calls, voicemail messages, and text or multimedia messages.  Providers may also have information about the dates, times, and methods of connecting associated with every communication in which a particular cellular device was involved.

54.     Many wireless providers retain information about the location in which a particular communication was transmitted or received.  This information can include data about which "cell towers" (i.e., antenna towers covering specific geographic areas) received a radio signal from the cellular device and thereby transmitted or received the communication in question.

55.     Wireless providers may also retain text messaging logs that include specific information about text and multimedia messages sent or received from the account, such as the dates and times of the messages.  A provider may also retain information about which cellular handset or device was associated with the account when the messages were sent or received.  The provider could have this information because each cellular device has one or more unique identifiers embedded inside it. Depending upon the cellular network and the device, the embedded unique identifiers for a

17

cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Station Equipment Identity ("IMEI"). When a cellular device connects to a cellular antenna or tower, it reveals its embedded unique identifiers to the cellular antenna or tower in order to obtain service, and the cellular antenna or tower records those identifiers as a matter of course.

56.     Wireless providers also maintain business records and subscriber information for particular accounts. This information could include the subscribers' full names and addresses, the address to which any equipment was shipped, the date on which the account was opened, the length of service, the types of service utilized, the ESN or other unique identifier for the cellular device associated with the account, the subscribers' Social Security Numbers and dates of birth, all telephone numbers and other identifiers associated with the account, and a description of the services available to the account subscribers. In addition, wireless providers typically generate and retain billing records for each account, which may show all billable calls (including outgoing digits dialed). The providers may also have payment information for the account, including the dates and times of payments and the means and source of payment (including any credit card or bank account number).

57.     In some cases, wireless subscribers may communicate directly with a wireless provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Wireless providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

58.     On January 11, 2018, I issued a preservation order to Verizon Wireless. The order requested that Verizon preserve all text message communications occurring over the target telephone through January 11, 2018. I have since communicated with Verizon that the preservation request was received and processed. Through my training and experience, I understand that text message communications at Verizon exist for periods of time, typically not exceed ten (10) days, and that these text messages may be preserved and provided to law enforcement with legal process. Based upon my training and experience, review of text messages exchanged between the Victim and "Long Steve Hill", and other aspects of this investigation, I believe that the above referenced text messages preserved by Verizon will provide additional evidence with respect to the illegal drug sales of "Hill Steve Long" to the Victim and others.

### INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

59.     I anticipate executing the search warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Verizon Wireless to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

### CONCLUSION

60.     I submit that this affidavit supports probable cause for a search warrant directed at Verizon Wireless for telephone text messages and other content associated with the Target Telephone, which items are described in Attachment A and which constitute evidence, fruits, and instrumentalities of criminal activity and, more specifically, violations of 21 U.S.C. §§ 841(a)(1) and

19

841(b)(1)(C) (Possession with Intent to Distribute and Distribution of heroin), and 21 U.S.C. § 846

(Conspiracy to Distribute heroin).

Jonah Mazzacane
Special Agent
Drug Enforcement Administration

Sworn to and subscribed before me this 23 day of March, 2018.

/s/ Sarah A. L. Merriam, USMJ

Honorable Sarah A.L. Merriam
United States Magistrate Judge

## ATTACHMENT A
## (Property to Be Searched)

This warrant applies to information associated with the account for telephone number (203) 802-7764, which is stored at premises owned, maintained, controlled, or operated by Verizon Wireless, wireless provider headquartered at Basking Ridge, New Jersey.

**ATTACHMENT B**
**(Items to be Seized from Verizon Wireless)**

**I.**     **Information to be disclosed by Verizon Wireless**

To the extent that information described in Attachment A is within the possession, custody, or control of Verizon Wireless, including any messages, records, files, logs, or information that have been deleted but are still available to Verizon Wireless or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Verizon Wireless is required to disclose the following information to the government for each account or identifier listed in Attachment A:

1.     All voice mail, text, and multimedia messages stored and presently contained in, or on behalf of the account or identifier;

2.     All existing printouts from original storage of all of the text messages described above;

3.     All transactional information of all activity of the telephones and/or voicemail accounts described above, including log files, messaging logs, local and long distance telephone connection records, records of session times and durations, dates and times of connecting, methods of connecting, telephone numbers associated with outgoing and incoming calls, cell towers used, and/or locations used from January 1, 2018, to January 11, 2018;

4.     All text messaging logs, including date and time of messages, and identification numbers associated with the handsets sending and receiving the messages;

22

5.      All business records and subscriber information, in any form kept, pertaining to the individual accounts and/or identifiers described above, including subscribers' full names, addresses, shipping addresses, date account was opened, length of service, types of service utilized, ESN or other unique identifier for the wireless device associated with the account, Social Security Number, date of birth, telephone numbers, and other identifiers a associated with the account;

6.      Detailed billing records, showing all billable calls including outgoing digits, from November 30, 2017, to the present;

7.      All payment information, including dates and times of payments and means and source of payment (including any credit or bank account number), from November 30, 2017, to the present.

**II.      Information to be seized by the government**

All information described above in Section I that that constitute fruits, evidence, and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (Possession with Intent to Distribute and Distribution of heroin), and 21 U.S.C. § 846 (Conspiracy to Distribute heroin), since November 30, 2017, including the following:

1.      The illegal procurement, possession, or distribution of controlled substances, including but not limited to ~~oxycodone;~~ heroin

2.      Records relating to who created, used, or communicated with the account or identified, including records about their identities and whereabouts.

23